UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RYAN LESSEM and DOUGLAS JOHNSON,                Civil Action No. 07 CV 10601

                                                Honorable Louis L. Stanton

                    Plaintiff(s),
v.

JAYCEON TERRELL TAYLOR p/k/a THE GAME,          **DECLARATION OF GARY
UMG RECORDINGS, INC., UNIVERSAL MUSIC           ADELMAN IN SUPPORT
GROUP, INC., INTERSCOPE RECORDS, INC.,          OF PLAINTIFFS MOTION
LASTRADA ENTERTAINMENT COMPANY, LTD.,           FOR SUMMARY
SONY/ATV MUSIC PUBLISHING, LLC,                 JUDGMENT**
UNIVERSAL MUSIC CORPORATION, WARNER
CHAPPELL MUSIC INC., MUSIC OF WINDSWEPT,
BLACK WALL STREET RECORDS, LLC and
BLACK WALL STREET PUBLISHING, LLC

                    Defendant(s).
-------------------------------------------------------------------X

      I, GARY ADELMAN, pursuant to 28 U.S.C. §1746(2), declare under the penalty of perjury that the following is true and correct:

      1.    I am a member of the law firm Robinson Brog Leinwand Greene Genovese & Gluck, P.C., attorneys for Plaintiffs Ryan Lessam ("Lessam") and Douglas Johnson ("Johnson) (collectively "Defendants").

      2.    I make this declaration in support of Defendants' motion for summary judgment against UMG Recordings, Inc. ("UMG"), Interscope Records, Inc. ("Interscope"), Universal Publishing Group, Inc. ("UPG"), Music of Windswept, LLC d/b/a Music of Windswept ("Windswept"), Black Wall Street Records, LLC ("BWS Records") and Black Wall Street Publishing, LLC ("BWS Publishing") and attach the documentary evidence upon which Defendants Rule 56.1 Statement of Undisputed facts is based and which such statement incorporates by reference.

{00475256.DOC;1}1

3. This action is based on Plaintiffs' claim that the composition "How We Do" which is commercially exploited by Defendants infringed upon Plaintiffs copyright in a composition entitled "Elevator."

4. As there is no direct proof of copying available here, the determinative questions as to Plaintiffs claim are whether Defendants had access to "Elevator," and whether "Elevator" and "How We Do" are substantially similar.

5. Compact discs with recordings of both songs, "Elevator" and "How We Do," are being delivered to the Court under separate cover as Exhibit "A".

6. Plaintiffs have known each other for a very long time and used to write, produce and record music together. Johnson also used to perform the songs that Plaintiffs had written and recorded. [ Deposition Transcript of Ryan Lessam ("Lessam Tr."), p. 40:9-12, 42:17-20, attached hereto as Exhibit B.]

7. Between 1998 and 2005 Plaintiffs attempted to "make it" in the music business in New York City and to get a record deal. [Deposition Transcript of Douglas Johnson ("Johnson Tr."), pg. 22:1-18, attached hereto as Exhibit C; Lessam Tr. 25:6-21, 42:23-24.]

8. Under the name "Grand Lie" they started a record label and a Publishing company. (Lessam Tr., p. 42:21-22, 240:13-15.)

9. In 2002 Lessam and Johnson wrote and recorded six (6) musical compositions, one of which was entitled "Elevator." (Lessam Tr., p. 106:13-25; Copyright registration Certificate No. SRu-466-925, attached hereto as Exhibit D.)

10. Plaintiffs had the idea for the composition of "Elevator" and independently created it. They produced the song together. (Lessam Tr., p. 250:15-251:6. Johnson Tr. p. 78:15-79-8. Johnson, Tr. 101:7-15.)

11. Johnson authored the lyrics and composed the music for Elevator. (Johnson Tr. p. 78:15-79-8; 101:7-15.)

12. Lessam provided input, criticism and contributed to the overall concept of the composition. Lessam also coined the songs title "Elevator." (Johnson, Tr. 103:14-23; 105:20-24.)

13. On May 3, 2002, Plaintiffs registered the six sound recordings and underlying compositions, including "Elevator," with the United States Copyright Office, attaining U.S. Copyright Registration No. SRu-466-925. (See Exhibit D.)

14. Plaintiffs further composed and recorded forty nine (49) separate musical compositions, so called "beats" intended for use in hip hop music and registered these with the United States Copyright Office. (Lessam Tr., p. 47:18-21.)

15. Between 2002 and at least 2005 Plaintiffs promoted and distributed the Songs, including "Elevator," to people working in, or connected to, the music industry in the hopes of securing a record deal with a major record label. (See Johnson Tr., p. 44:1-2, 16-18; Lessam Tr., p. 117:6-20.)

16. Plaintiffs promoted the Songs, including "Elevator," by public performance in music venues, by distributing CDs and/or by playing the songs for individuals in the music industry. (Lessam Tr., p. 69:11 – 72:15; 73:13-19; Johnson Tr., 50:6-12, Lessam Tr., p. 100:19 – 103:03.)

17. Plaintiffs were intensely "shopping" "Elevator." They played the song and gave or sent a copy of the song to many people in the music industry. ( Johnson Tr., p. 50:6-12, Lessam Tr., p. 100:19 – 103:03.)

18. Plaintiffs considered "Elevator" one of their main songs that they were trying to

get a record deal with.  (Johnson Tr., p. 50:5-11.)

19. Plaintiffs had also formed a music group called "Counterclockwise."  Members of the group were Lessam, Douglas and a female singer by the name of Kaya.  Douglas and Kaya would promote the songs by performing them in various music venues and clubs in New York City. ( Lessam Tr., p. 69:11 – 72:15; 73:13-19.)

20.  In addition to producing and recording music, Plaintiff Lessam, between 1998 and 2004, for the most part held a day job as a sales employee at Sam Ash, a music equipment store located in New York City. (Lessam, Tr., p. 25:3-4.)

21. During his time at Sam Ash, Lessam met Chauncey A. Pope a/k/a Che Pope a/k/a Che Vicious ("Pope"), a renowned hip hop music producer, who also regularly purchased music equipment at Sam Ash. ( Lessam Tr., p. 164:22-24. )

22. Upon information and belief Pope formerly used the alias Che Pope and nowadays is known as Che Vicious.  (See printout from www.discogs.com, an online database containing information on artists, labels, and their recordings, attached hereto as Exhibit E.)

23. Lessam personally sold equipment to Pope on multiple occasions.  (See Sam Ash sales order receipts, attached hereto as Exhibit F; Lessam Tr., p. 185:4-6. )

24. When the Sam Ash store manager was not present, Lessam was Pope's main contact at the store. (Lessam Tr., p. 188:9-10.)

25. Lessam would regularly play the music Plaintiffs had produced and recorded to Pope at the store.  (Lessam Tr. p. 164:22 -165:2.)

26. Pope invited Plaintiffs to play more music for him.  Lessam and Johnson met with Pope at the recording studio "Chung King" in Lower Manhattan, New York City.  They played "Elevator" for Pope on a CD player at the studio during that meeting. ( Lessam Tr., p. 173:4-

174:4. Johnson Tr., p. 47:15-18.)

27. Lessam also mailed Pope a CD containing "Elevator," and other songs. (Lessam Tr., p. 171:5-7.)

28. In January 2005 defendant Universal Music Group, Inc. ("UMG"), through its division, Interscope Records, Inc. ("Interscope") and Aftermath Entertainment "Aftermath"), which in turn is an affiliate of Interscope, released an album of recorded music entitled "The Documentary " ("Album"), containing the recorded performances of the artist Jayceon Taylor, p/k/a "The Game" ("Taylor"), and other performing artists as so called featured guests. [See Answer to the complaint by UMG Recordings, Inc.; Interscope Records; A Division of UMG Recordings, Inc. and Universal Publishing Group, Inc. ("UMG Answer"), ¶ 23, attached hereto as Exhibit G. ]

29. The Album includes a recording of the composition "How We Do" performed by Taylor and Curtis Jackson p/k/a "50 Cent" ("Jackson"). [Exhibit G, ¶ 26.]

30. The Album, including "How We Do," was released by UMG, through its division Interscope on January 18, 2005. [Exhibit G, ¶ 26.]

31. The Album has sold millions of copies worldwide. (See printout of an article from www.wikipedia.com regarding the album "The Documentary" attached hereto as Exhibit H. )

32. Upon information and belief, Interscope and Aftermath also released "How We Do" as a single CD version. (See printout from www.amazon.com, attached hereto as Exhibit I.)

33. Upon information and belief, the single CD version sold in excess of 700,000 copies.

34. The record label Aftermath was founded by recording artist/hip hop producer

Andre Young p/k/a Dr. Dre ("Young").  (See printout of Wikipedia article regarding Aftermath Entertainment, attached hereto as Exhibit J.)

35. At the time the Album was created, Pope was working for Aftermath as a music producer.  (See printout of search result for "Che Vicious" from www.barnesandnoble.com, indicating that Pope (under the alias Che Vicious) acted as a writer/producer on albums released by Aftermath, attached hereto as Exhibit K.  See also printout of profile of Che Vicious from www.hiphoplives.com, attached hereto as Exhibit L.  See also interview with Che Vicious from Aftermath's website www.aftermathmusic.com, attached hereto as Exhibit M. )

36. In connection with his work for Aftermath, Pope had a contractual relationship with the label, through Pope's publishing company, Vicious, Inc, pursuant to which Pope was to provide music production services to Aftermath. (See agreement between Vicious, Inc. and Aftermath, which will be filed with the Court under seal pursuant to the protective order between the parties as Exhibit N.)

37. The aforementioned agreement was entered into prior to the release of the Album between "Aftermath Entertainment c/o Interscope Records" and Vicious, Inc. f/s/o Che Pope and is dated April 1, 2004.

38. Pope worked as a producer on the Album and is credited as a producer in the Album's booklet, along with Taylor, Jackson, Mike Elizondo ("Elizondo"), Andre Young  p/k/a Dr. Dre ("Young"), and other individuals.  (See Producer Credit in the booklet of the Album, UMG 00001-UMG 00008, see UMG 00002, attached hereto as Exhibit O.)

39. Pope, together with Young, is credited as a producer of the recording "Intro" of the Album.  (See Exhibit O, UMG 00002.)

40. Pope, together with Young, Elizondo and one Mark Batson, is also listed as an

author of music concerning the composition "Higher" from the Album on the copyright registration for said composition.  (See a true and correct printout of copyright registration No. PA0001277484 from the public catalogue of the United States Copyright Office website located at www.copyright.gov, attached hereto as Exhibit P.)

41.	Young and Jackson (under their aliases Dr. Dre and 50 Cent) are listed as executive producers in the booklet of the Album.  (See Exhibit O, UMG 00007)

42.	With respect to "How We Do," Taylor, Jackson, Young and Elizondo are listed as authors and Young and Elizondo are listed as the recording's producers. (See Exhibit O, UMG 0003.)

43.	Taylor, Jackson, Young and Elizondo are also listed as the writers of "How We Do" on the online database of the American Society of Composers, Authors and Publishers ("ASCAP").  (see printout attached hereto as Exhibit Q.)

44.	Pope clearly had a working relationship with Young, Elizondo and Jackson, as he has collaborated with them as a music producer on many other recordings and albums.  He is listed together with them on the copyright registrations of numerous other works.  (See a true and correct printout of copyright registrations from the public catalogue of the United States Copyright Office website located at www.copyright.gov, attached hereto as Exhibit R.)

45.	The above evidence clearly establishes Plaintiffs had played "Elevator" for Pope and sent him a copy of the song,

46.	Pope worked with Young, Jackson and Elizondo on several other music projects.

47.	Moreover, it was demonstrated that he is a producer affiliated with Aftermath which is a subsidiary of Interscope and co-released the Album.

48.	Among the other artists involved in the production of the Album were Young and

Jackson as the executive producers of the Album.

49. They, together with Taylor and Elizondo, also wrote "How We Do" and most of the other compositions of the Album

50. Additionally, it was shown that Pope is listed as an author on copyright registrations of other recordings from the Album.

51. Hence, it is obvious that there was more than a reasonable chance, that the four writers Taylor, Jackson, Young and Elizondo, or at least one of them, had the possibility to hear "Elevator" prior to writing and recording "How We Do."

52. Since its release the Album has been sold and continues to be sold by UMG, through its division Interscope, and Aftermath, in the United States and elsewhere. (Exhibit G, ¶ 27. )

53. The Album has also been commercially exploited by BWS Records and BWS Publishing. BWS is listed as a claimant of copyright on the majority of the copyright registrations for compositions/recordings from the Album, including "How We Do." (See printouts of copyright registrations from the public catalogue of the United States Copyright Office website located at www.copyright.gov, attached hereto as Exhibit S.)

54. BWS Records is the record label of Taylor and BWS Publishing is his publishing company. (See excerpts of deposition transcript of John Dash, p. 13:17-20, attached hereto as Exhibit T.)

55. The Album has also been commercially exploited by Windswept. Windswept is listed as a claimant of copyright on numerous copyright registrations for compositions/recordings from the Album, including "How We Do." (See Exhibit S.)

56. Through its division Interscope Records UMG also authorized the manufacture

and sale of the Album.  (Exhibit G, ¶ 34.)

57.     UMG claims to have the right to record, manufacture, and release the recorded performances of the Album, including "How We Do."  (Exhibit G, ¶ 35.)

58.     Defendants did not seek permission from Plaintiffs to use any part of "Elevator" and contend that no such permission was necessary.  (Exhibit G, ¶ 36.)

59.     Defendants have authorized third parties to use "How We Do" in various mediums and forms, including in timed synchronization to visual images.  (Exhibit G, ¶ 38.)

60.     Upon information and belief, Defendants have been aware of Plaintiffs' claim that "How We Do" infringes upon their copyright in the song "Elevator," since at least early 2006.

61.     Plaintiffs' former counsel had engaged in settlement discussions with Taylor. However, a settlement was never reached.  (See Lessam Tr., p. 209:18-20, 217:2-12.)

62.     Defendants deny infringing upon Plaintiff's copyrights in "Elevator."  (Exhibit G, ¶ 41-43.)

## PROCEDURAL HISTORY

63.     On November 27, 2007, Plaintiffs filed their Complaint alleging copyright infringement, (See complaint attached hereto as Exhibit U.)

64.     Defendants Universal Music Group, Inc., Interscope Records, Inc., Universal Music Publishing Group, Inc., and Music of Windswept, LLC d/b/a Music of Windswept answered the Complaint on April 30, 2008. (Ex. G and Answer of Music of Windswept, attached hereto as Exhibit V).

65.     Defendants Black Wall Street Records, LLC and Black Wall Street Publishing, LLC answered the complaint on March 27, 2009, (see attached Exhibit W.)

66.     On April 4, 2008 the Court bi-furcated the liability and damages phases of this

action. (see copy of the order attached hereto as Exhibit X.)

67.     The parties engaged in fact and expert liability discovery from May 22, 2008 through August 28, 2009.

68.     Plaintiffs offered the expert report, the rebuttal expert report and testimony of its expert witness Dr. E. Michael Harrington, Professor of Music and Music Management at William Paterson University ("Harrington") in support of their claim for copyright infringement. Defendant's also deposed John Dash for BWS Records and BWS Publishing.

69.     Defendants offered the reports and testimony of its expert witnesses Dr. Lawrence Ferrara, PhD, Professor and Chair of the Department of Music and Performing Arts at New York University ("Ferrara").  The expert report Defendants also deposed both Plaintiffs.

## THE SIMILARITIES BETWEEN "ELEVATOR" AND "HOW WE DO"

70.      "Elevator" was composed and recorded before "How We Do" was composed and recorded.  (See Exhibits C and G.)

71.     Both songs "Elevator" and "How We Do" were examined by Plaintiffs' expert Harrington and by Defendants' expert Ferrara.

72.     Harrington thoroughly explored the similarities of the two compositions/recordings in his expert report ("Harrington Report"). (a true and correct copy of the Harrington Report is attached hereto as Exhibit Y.)

73.     At the outset, Harrington determined that both "How We Do" and "Elevator" are songs of the contemporary hip hop genre. (Exhibit Y, Harrington Report, p. 2.)

74.     Plaintiffs' expert then continued to survey the similarities of the two works, by listening to both tracks and examining, among other things the style, tempo, meter, pitch center, lyrics, motive, structure, and performance. (Exhibit Y, Harrington Report, p. 2) He reached the

following conclusions:

75. After analyzing the two songs Dr. Harrington found that there were many similar structural elements indicating that the creators of "How We Do" indeed intentionally copied from "Elevator." (See Exhibit Y, Harrington Report p.1.)

76. In addition to the style of music, he found that the two works are identical in tempo and meter. (See Exhibit Y, Harrington Report p. 3.)

77. The two songs also have a very close pitch center, as "Elevator" is centered around the pitch-class E flat and "How We Do" is centered around the pitch-class E natural. (See Exhibit Y, Harrington Report p. 3.)

78. With respect to the lyrics of the two songs, he found that the preeminent phrase of the lyrics of both songs is "this is how we do," and that those lyrics are situated at the beginning of each chorus. (See Exhibit Y, Harrington Report p. 3. )

79. In analyzing the motive of the two songs, Harrington found similarities, too. In context of structure, the motive of a composition is the most important and most recognizable element in a composition. (See Exhibit Y, Harrington Report p. 3.)

80. In "Elevator" Harrington determined that the motive consisted of the lyric "this is how we do," sung to a specific five (5) note pattern consisting of at least five (5) quarter notes of two (2) quarter note triplets (hereinafter "Elevator's Motive."). Harrington also found that the motive in "How We Do" was identical to Elevator's Motive. How We Do's motive also consisted of the lyric "this is how we do," sung to a specific five (5) note pattern consisting of at least five (5) quarter notes of two (2) quarter note triplets. (See Exhibit Y, Harrington Report p. 3.)

81. Elevator's Motive occurs at the beginning of the chorus in both "Elevator" and

"How We Do." In addition to this, Elevator's Motive occurs the same number, i.e. four (4) times, within the chorus of either of the songs. (See Exhibit Y, Harrington Report p. 4.)

82. In addition to the identity of times Elevator's Motive appears in chorus, and the identity of tempo and meter, the fact that the choruses of both songs are exactly twenty (20) seconds long in the first repetition and nineteen (19) seconds long in the second repetition, with Elevator's Motive being repeated four (4) times within each chorus, is further evidence to the effect that "Elevator" was copied from. (See the Structural Charts of "How We Do" and "Elevator" in Dr. Ferrara's expert report ("Ferrara Report"), p.6, as shown below and (attached hereto as Exhibit Z.)

| "How We Do" Structural Chart | | "Elevator" Structural Chart | |
|---|---|---|---|
| 0:00 | Introduction | 0:00 | Introduction |
| 0:24[5] | Chorus (*lyrics at issue* 4x) | 0:15 | Verse 1 |
| 0:44 | Verse 1 | 0:53 | Pre-Chorus |
| 1:23 | Verse 2 | 1:03 | Chorus (*lyrics at issue* 4x) |
| 2:02 | Chorus (*lyrics at issue* 4x) | 1:23 | Verse 2 |
| 2:22 | Verse 3 | 2:02 | Pre-Chorus |
| 2:41 | Verse 4 | 2:12 | Chorus (*lyrics at issue* 4x) |
| 3:21 | Ending (to 3:54 including fade) | 2:31 | Verse 3 |
| | | 3:11 | Pre-Chorus |
| | | 3:20 | Chorus (*lyrics at issue* 4x) |
| | | 3:40 | Ending (to 3:45, no fade) |

(Bracket 2 applies to "How We Do" chart; bracket 3 applies to "Elevator" chart.)

---

[2] The time interval between the beginning of the chorus and the beginning of Verse 1 in "How We Do" is exactly twenty (20) seconds.
[3] The time interval between the beginning of the chorus and the beginning of Verse 2 in "Elevator" is exactly twenty (20) seconds.

83. In "Elevator" the Motive is heard four (4) times in each of the three (3) places where the chorus occurs, for a total of twelve (12) times. In "How We Do" Elevator's Motive is repeated by way of the chorus, four (4) times in each of the two (2) places where the chorus occurs, for a total of eight (8) times by way of the chorus. Substantially adding to the evidence of copying, the Elevator Motive is repeated forty seven (47) times instrumentally throughout "How We Do." Harrington found that the more frequent vocal and instrumental repetition of Elevator's Motive in "How We Do" amplified the substantial similarity between "How We Do" and "Elevator." (See Exhibit Y, Harrington Report p. 3-5.)

84. Further, Harrington also opined that the performance of the two Motives was similar. Harrington stated that he knew "of no other pair of songs that are identical with respect to an identical five-word chorus, performed at the identical tempo, with the identical unusual rhythm and in the same section of chorus." (See Exhibit Y, Harrington Report p. 5.)

85. Plaintiff's Expert conclusion of his analysis was that it was obvious to him "that TAYLOR ["How We Do"] and LESSEM ["Elevator"] are substantially similar and that TAYLOR ["How We Do"] consciously and intentionally copied the most original, copyrightable and significant expression in LESSEM ["Elevator"]." (See Exhibit Y, Harrington Report p. 6.)

86. Harrington determined that that "Elevator" and "How We Do" feature similarities that could only have resulted from copying. In Plaintiffs' expert's opinion "How We Do" was not independently created, but could only have occurred by means of copying "Elevator." [See Plaintiffs' Rule 26(a)(2) Supplemental Disclosure of Expert Testimony ("Harrington Supplemental Report"), p. 2 attached hereto as Exhibit AA.]

87. Referring to "Elevator" and "How We Do" Harrington at his deposition fortified his view that the authors of "How We Do" did not originate the chorus of the song, but copied it, because he had "never seen two songs that have the same words with the same rhythm at the same speed, used the same way, essentially, question, answer, and in the chorus. (See excerpt of deposition transcript of Dr. Harrington, p. 332:7-333:7, attached hereto as Exhibit BB.)

88. In fact, Defendants own expert Dr. Ferrara admitted during his deposition (See excerpt of "Ferrara Transcript," attached hereto as Exhibit CC) that the lyrical phrase "this is how we do" along with the underlying music, in "Elevator" sounds like the lyrical phrase "this is how we do" and underlying music in "How We Do:"

> Q. So is it fair to say, then, that "this is how we do" in "Elevator" sounds like "this is how we do" in "How We Do"?
> Ferrara Tr. p 205:3-5.
> . . .
>
> A. Yes. We're talking about that one phrase, that one bar?
> Q. I'm not sure how you're defining "bar," but I'm defining the lyrical phrase and the music, the underlying music.
> A. Yes.
> Q. Yes?
> A. Yes.

(Exhibit CC Ferrara Tr., p. 205:8-15. )

89. It should be noted that as previously mentioned, Harrington defined the Elevator's Motive as "the lyric 'this is how we do,' sung to a specific five (5) note pattern consisting of at least five (5) quarter notes of two (2) quarter note triplets." Defined in other words Elevator's Motive could be described as the lyrical phrase "this is how we do" and the underlying music. The experts may be using different verbiage in their definitions, but in essence they have both testified that the motive in "How We Do" sounds like the motive in "Elevator." Therefore, as to the issue of similarity between the motive in "How We Do" to the motive of "Elevator," there

{00475256.DOC;1}14

can be no genuine issue of material fact.

90. Here, both experts have opined that the motive in "How We Do" sounds like the motive in "Elevator." In addition to this Plaintiffs have further demonstrated that there are many other identical and/or similar elements in "How We Do" and "Elevator." Furthermore, there is expert testimony that the frequency at which the similarities are utilized in "How We Do" greatly enhance its substantial similarity to "Elevator" and that all of the above similarities are probative that the Elevator Motive in "How We Do" was copied intentionally from "Elevator."

91. As demonstrated above, Plaintiffs' have established undisputed evidence of access and ample similarities between the two works, which are probative that "How We Do" was copied from "Elevator." As such no reasonable juror could find that actual copying has not occurred here.

Respectfully submitted,

____/S/_____
Gary Adelman (GA7138)

Dated: New York, New York
April 16, 2010