☐ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2-3-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
RYAN LESSEM and DOUGLAS JOHNSON,

                Plaintiffs,

                                   07 Civ. 10601 (LLS)

      - against -

                                  OPINION AND ORDER

JAYCEON TERRELL TAYLOR p/k/a THE GAME, UMG
RECORDINGS, INC., UNIVERSAL MUSIC GROUP,
INC., INTERSCOPE RECORDS, INC., UNIVERSAL
MUSIC CORP., WARNER CHAPPELL MUSIC, INC.,
MUSIC OF WINDSWEPT, BLACK WALL STREET
RECORDS, LLC, and BLACK WALL STREET
PUBLISHING, LLC,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - -X

    Three summary judgment motions are before me in this copyright infringement action.

    Plaintiffs Ryan Lessam[1] and Douglas Johnson move for summary judgment that defendants' song "How We Do" infringes their copyrighted song "Elevator".

    Defendants Windswept Holdings, LLC, d/b/a Music of Windswept, UMG Recordings, Inc., Interscope Records, a Division of UMG Recordings, Inc., and Universal Music Publishing Group, Inc. (the "UMG Defendants") move for summary judgment dismissing

---

[1]     Several of the parties' names are stated in different ways throughout the motion papers and are incorrect in the case caption. I use the names as stated in the notices of motion. The parties use "p/k/a" to indicate "professionally known as."

this action on the grounds that the authors of "How We Do" did not have access to "Elevator" and the two songs share only common, unprotectible elements.

Defendants Black Wall Street Records, LLC and Black Wall Street Publishing, LLC (the "BWS Defendants") join the UMG Defendants' motion and separately move on the additional grounds that they do not own the copyright in the allegedly infringing "How We Do" and did not cause plaintiffs' alleged damages.

For the reasons that follow, plaintiffs' and the UMG Defendants' motions are denied, and the BWS Defendants' motion is granted.

### Background

The following facts are undisputed, except where noted.

Plaintiffs wrote and recorded "Elevator" in 2002, and included it on a compact disc titled "Counterclockwise:  Six Songs Recorded 4-02".  Plaintiffs registered those six songs with the Copyright Office on May 3, 2002.  "Elevator" is in the contemporary hip hop genre, and the lyric phrase "this is how we do" appears four times in each of its choruses.  "Elevator" was not commercially distributed, nor played on the radio, nor sold in any store, nor released on the Internet.  As of 2002, Lessam had created and recorded at least 55 separate musical tracks, a number of which Johnson co-wrote.  Plaintiffs testified that

- 2 -

"Elevator" was one of the main songs with which they were trying to secure a record deal and one of the songs that "were going to be our hits." Johnson Dep. 50:5-9; Lessam Dep. 109:9-23.

"How We Do" was written in 2004 by Jayceon Taylor[2] p/k/a The Game, Andre Young p/k/a Dr. Dre, Michael Elizondo, and Curtis Jackson p/k/a 50 Cent (the "How We Do Writers"), and included on Taylor's album "The Documentary", which was released in 2005 by defendant Interscope Records and has sold over one million copies worldwide.  "How We Do", like "Elevator", is a contemporary hip hop song, and likewise contains the phrase "this is how we do" four times in each of its choruses.  The UMG Defendants concede for their motion that the phrase is set to the same rhythm in both songs, and in any event, any differences in the phrases' rhythm are not decisive.  The two songs also share the same tempo.

Jackson contributed the phrase "this is how we do" to "How We Do".  In 1999, Jackson co-wrote and recorded a song titled "How To Rob" with a performer known as The Madd Rapper, in which The Madd Rapper uses the phrase "this is how we do."

The How We Do Writers have never met or spoken with plaintiffs, and plaintiffs never sent any of their music to the

_____

[2]    Though Taylor is named as a defendant in the caption, he has not appeared in this action, and the docket does not reflect that he or Warner Chappell Music, Inc. was served with the summons and complaint.

How We Do Writers.

Plaintiffs claim they developed a relationship with record producer Che Pope, who has worked with the How We Do Writers on other songs. Pope and Young produced a recording on "The Documentary" titled "Intro", and with Elizondo are co-authors of another song on "The Documentary", titled "Higher". Pope has co-authored several other songs with Young, Elizondo, and Jackson, some predating and others postdating the release of "The Documentary".

At his deposition, Lessam described his relationship with Pope: From 1998 to 2004, Lessam worked off and on as a sales employee at Sam Ash, a music equipment store in New York City. Lessam Dep. 25:3-12. Pope was a "good customer" there, id. at 185:12-13, and when the store manager was not present Lessam was Pope's "go-to guy." Id. at 188:6-18. Lessam would play his music for Pope at Sam Ash whenever he had something to play, and Pope would listen. Id. at 164:22-165:4. On one occasion, Lessam and Johnson accepted Pope's invitation to play their music for him at the recording studio Chung King, which they did for approximately 10 minutes. Id. at 173:4-13, 174:2-4, 174:20-22. Lessam also sent a CD of his music to Pope. Id. at 171:5-25.

Pope does not remember meeting plaintiffs, or ever hearing or receiving their music. Pope Decl. ¶¶ 5-6. For purposes of

- 4 -

their motion, however, the UMG Defendants do not dispute that Lessam met Pope at Sam Ash and sold him music equipment several times.

## Discussion

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "This standard requires that courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted).

## Elements of Copyright Infringement

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003), citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998). For purposes of their motions, defendants admit plaintiffs' ownership of the copyright in "Elevator".

To establish unauthorized copying, "a plaintiff must show

both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" Jorgensen, 351 F.3d at 51, quoting Castle Rock, 150 F.3d at 137. Actual copying may be established with evidence that the composer of the defendant's work had access to the copyrighted work, "and that there are similarities between the two works that are 'probative of copying.'" Jorgensen, 351 F.3d at 51, quoting Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997). "The plaintiff then must show that the copying amounts to an 'improper' or 'unlawful' appropriation by demonstrating that substantial similarities relate to protectible material." Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992) (citation omitted).

### 1.  Access

A claim of access must be supported with "significant, affirmative and probative evidence" showing that the "alleged infringer had a reasonable possibility — not simply a bare possibility — of hearing the prior work; access cannot be based on mere speculation or conjecture." Jorgensen, 351 F.3d at 51 (internal quotation marks omitted).  "'A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer.'"

Id. at 53 (emphasis omitted), quoting Towler v. Sayles, 76 F.3d 579, 583 (4th Cir. 1996); see also Gaste v. Kaiserman 863 F.2d 1061, 1067 (2d Cir. 1988) ("Access through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work.").

Plaintiffs' theory of access is that "As a result of their close working relationship with Pope, there was ample opportunity for Pope to play 'Elevator' to the Producers of 'How We Do' and/or give them a copy of the song." Pls.' Apr. 16, 2010 Mem. 5.   That theory requires examining the connection between both (1) plaintiffs and Pope and (2) Pope and the How We Do Writers.

### a. The Connection Between Plaintiffs and Pope

There is a genuine issue of material fact whether Pope ever heard "Elevator" or was given a copy of the song.

Defendants focus on the various sections of plaintiffs' deposition testimony in which plaintiffs state that they do not specifically recall playing "Elevator" for Pope or giving him a copy of the song.   For example, Lessam testified:

> Q.   . . . Well did you play him specifically the song Elevator from one of the recordings that you made?
> A.   I'm not sure if I played him Elevator at Sam Ash or if I mailed it to him or if I played it for him in Chung King that day, because I don't remember the dates.
> Q.   So you don't remember whether you played Elevator

> for him at Sam Ash, that's correct?
>
> A.   I can't say for sure that's where he heard that song, but he certainly heard our music at Sam Ash multiple times.

Lessam Dep. 166:12-24.   Johnson likewise testified that he does not recall which songs plaintiffs played for Pope at Chung King, Johnson Dep. 50:25-51:12, and the record does not reveal when that meeting took place.   With respect to sending music to Pope, Lessam testified that he recalls sending a CD to Pope, Lessam Dep. 171:5-17, but does not recall when he did so, id. at 172:13-15, and he did not state which songs he sent.

That testimony is too inconclusive to compel a finding that plaintiffs have established access as a matter of law.   Nor does it warrant entering judgment for defendants.   There are portions of Lessam's testimony from which a reasonable jury could conclude that Pope either heard or was given a copy of "Elevator".   For example, Lessam testified, "Different occasions at the store he heard the song." Lessam Dep. 165:5-6.   Later in his deposition he testified:

> Q.   . . . So, again, sitting here today, can you identify which of the 60-plus odd songs or portions of songs that are on the sound recordings that you supposedly played for Mr. Pope?
>
> A.   Sure.   The six on that one[3] for sure, because that was my biggest demo.

Id. at 168:24-169:6.   And later:

---

3   "Elevator" is on the six-song disc "Counterclockwise".

- 8 -

Q.   And you say you mailed him a copy of a CD, correct?
A.   Yes.
Q.   Is that the only instance where you actually physically gave him an additional copy?
A.   No, I think I probably gave him copies before in the store.
Q.   Well, once again, sir, are you speculating?
A.   I always had the demo on me, if he wanted it.  I mean, I know he heard it in the store.  He heard some of our music in the store.

Id. at 181:12-18.  Though Lessam admitted that he has no specific recollection of playing Pope the six songs, id. at 169:12-14, or giving him a copy of a specific recording, id. at 182:4-10, it is the function of the jury to weigh plaintiffs' assertions and the quality of their recollection under all the circumstances of their relationships.

**b. The Connection Between Pope and the How We Do Writers**

Defendants have submitted declarations from Pope and each of the How We Do Writers, which they argue demonstrate that the How We Do Writers did not have access to "Elevator".  Those declarations, however, are weaker than those submitted in the cases on which defendants rely.

In Chapman v. Universal Motown Records Group, No. 08 Civ. 3255 (LAP), 2010 WL 517480, at *4 (S.D.N.Y. Feb. 4, 2010), the composer of the defendant's song stated in his declaration that he never received a copy of any of the plaintiff's music, never heard the plaintiff's song before plaintiff asserted his

infringement claim, and did not know the alleged third-party intermediary.

In Tomasini v. Walt Disney Co., 84 F. Supp. 2d 516, 520 (S.D.N.Y. 2000), the alleged intermediary testified that he never showed the plaintiff's work "to anyone at any time," and employees of the defendants "stated under oath that they never personally received, reviewed, or heard of" plaintiff's work.

In Jorgensen v. Careers BMG Music Publishing, No. 01 Civ. 0357 (LAP), 2002 WL 1492123, at *4 (S.D.N.Y. July 11, 2002), the alleged intermediary stated in his declaration that "he never forwarded plaintiff's songs to anyone," and had no creative involvement with, nor even met, the writers of the defendant's song.

In Cox v. Abrams, No. 93 Civ. 6899 (RJW), 1997 WL 251532, at *4 (S.D.N.Y. May 14, 1997), the defendants had sworn that prior to the action's commencement they had not heard of the plaintiff or her work, "and that they neither saw a copy of the manuscript nor were informed of its contents."  The alleged intermediaries all stated under oath "that they did not provide any part of the manuscript, or communicate its substance, to any of the defendants." Id.

Here, on the other hand, Jackson — who contributed the phrase "this is how we do" to defendants' song — does not state

in his declaration that he never heard "Elevator", and says nothing about Pope. Jackson says only that he "never heard of Mr. Lessem and Mr. Johnson until now" and "never met either of them, and never received any of their music, including a song called 'Elevator'." Jackson Decl. ¶¶ 4-5.

Pope states in his declaration that he had no role or input in, and was not present for, "the creation, production or recording of any of the lyrics or music of 'How We Do'." Pope Decl. ¶ 3. His statements regarding his relationships with plaintiffs and their music, however, are less definite:

> 5. Although I have purchased products at the Sam Ash store in the past, I have no recollection of meeting either of the Plaintiffs, or of hearing their music, at any point in time.
>
> 6. I also have no recollection of ever receiving any music in the mail from Mr. Lessem.
>
> 7. As I did not obtain any copy of the Plaintiffs' music, including any song called "Elevator", I did not provide anyone, including any of the writers of "How We Do", with any of Plaintiffs' music.

Id. ¶¶ 5-7. Read in the light most favorable to plaintiffs, those paragraphs show little more than that Pope does not remember anything about plaintiffs or their music: Pope's assertion that he did not provide "Elevator" to anyone is based on his not obtaining a copy of it, which Pope simply does not recall.

Were a jury to find that Pope had a copy of "Elevator" or

- 11 -

was otherwise familiar with the song, those weaknesses in defendants' declarations, combined with Pope's working relationship with the How We Do Writers, including work on two songs that appear on the same album as "How We Do", might allow a reasonable jury to find that the How We Do Writers had access to "Elevator".

## 2.  Probative Similarity

The probative similarity inquiry is whether copying has occurred as a factual matter, without regard to whether the copying is actionable. See Ringgold v. Black Entm't Television, 126 F.3d 70, 74-75 (2d Cir. 1997).  Expert testimony may be used to demonstrate probative similarity. See Repp, 132 F.3d at 889.

Both sides have submitted expert reports containing musicological analyses of "Elevator" and "How We Do". Defendants argue that the reports of plaintiffs' expert, Dr. E. Michael Harrington, are inadmissible under Federal Rule of Evidence 702 — which requires that "the witness has applied the principles and methods reliably to the facts of the case" — because Dr. Harrington "admittedly failed to follow his own stated methodology." UMG Defs.' Apr. 16, 2010 Mem. 19.

In his preliminary report comparing the two songs, Dr. Harrington states:

> My methodology for comparative musicological analysis
> is to examine the style, subject matter, tempo,

> structure, tonality, form, harmony, melody, lyrics and
> rhyme scheme of each song in question and compare and
> evaluate the songs with careful consideration of prior
> and contemporary musical sources.

Harrington Nov. 4, 2008 Report 2.

Defendants challenge Dr. Harrington's reports because they do not analyze subject matter, tonality, form, or harmony; do not provide a complete analysis (i.e., of each song from beginning to end) of rhyme scheme, lyrics, or melody; and do not document his searches for prior and contemporary musical sources.

At his deposition, Dr. Harrington testified that he analyzed each component of his methodology, but did not find the omitted components important to include in his reports. Harrington Dep. 87:15-23, 108:18-109:4. Dr. Harrington included what he thought was "appropriate" in analyzing the songs, id. at 123:25-124:7, which was what he "believed to be the important parts of the piece, the parts that were so similar," id. at 92:1-7.

Dr. Harrington states in his reports that those similar portions — the phrase "this is how he do" set to the same rhythm and tempo, used four times in the songs' choruses — standing alone compelled him to conclude that "How We Do" was created "through conscious and intentional copying" of "Elevator". Harrington Nov. 4, 2008 Report 1. To be sure, by

- 13 -

limiting his report to the most similar portions of the two songs, Dr. Harrington did not provide a full analysis of the songs' differences.   The claim of infringement in this case, however, relates only to the aspects of the songs on which Dr. Harrington focused.   That Dr. Harrington did not analyze in his reports the components of his methodology not related to the claimed infringement — and thus did not explain why the other aspects of the songs do not affect his conclusion — is grounds for cross-examination, not exclusion.

Defendants also complain that Dr. Harrington did not document his search for prior and contemporary musical sources. Dr. Harrington states in his preliminary report that he "conducted a prior musical sources search using my computer database containing the chord progressions and other musical aspects of more than 13,000 songs," which he compiled "over the course of 32 years" and contains songs "from numerous musical styles," all of which Dr. Harrington "personally transcribed and analyzed." Id. at 2.   Dr. Harrington did not document the results of his search or explain how it influenced his conclusion in his preliminary report.

In his rebuttal report, however, Dr. Harrington addresses the prior art documented by Dr. Ferrara and explains:

> If other songs existed that feature the same words and rhythms and same tempos in important identical

> sections and could be shown to have been created
> independently, then independent creation would be
> somewhat more conceivable.  But because neither expert
> has found any other songs exhibiting such traits, the
> possibility of independent creation remains moot.

Harrington Jan. 22, 2009 Report 2; see also id. at 5, 7.  Once
again, whatever can be made of this material's absence from his
initial report is left for cross-examination, not exclusion from
evidence.

Defendants argue, supported by Dr. Ferrara's opinion, that
each of the similarities between the two songs is so commonplace
that as a matter of law it cannot prove probative similarity,
that is, that the similarities cannot be shown to have resulted
from copying, as opposed to coincidence.  It is Dr. Harrington's
opinion, however, that it is the aggregate of the similarities,
not any one of them individually, that compels the conclusion of
copying.  These and other disagreements between the sides'
experts (e.g., on the conclusion to be drawn from the phrase
"this is how we do" in the 1999 song "How To Rob" which Jackson
co-wrote and recorded with The Madd Rapper) illustrate the
inappropriateness of summary judgment of these issues.

### 3.  Improper Appropriation

To establish improper appropriation, plaintiffs must
demonstrate "that substantial similarities relate to protectible
material." Laureyssens, 964 F.2d at 139-40.

Defendants argue that the only portions of "Elevator" and "How We Do" alleged to be similar — the phrase "this is how we do," the rhythm and tempo to which it is set, and its appearance in each songs' chorus four times — are unoriginal and therefore unprotectible.

"[C]opyright protection may extend only to those components of a work that are original to the author." Feist, 499 U.S. at 548. Regarding originality, the Feist Court explained:

> The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; only a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

Id. at 345 (emphasis in original) (citations and internal quotation marks omitted).

Common phrases are not subject to copyright protection, see, e.g., Acuff-Rose Music, Inc. v. Jostens, Inc., 155 F.3d 140, 144 (2d Cir. 1998) (phrase "You've got to stand for something or you'll fall for anything" too common to be protectible), nor are elements taken from the public domain, see

- 16 -

Boissan v. Banian, Ltd., 273 F.3d 262, 268 (2d Cir. 2001). Dr. Harrington admits that plaintiffs "did not originate the five words, 'this is how we do,' or the 5-note rhythm," Harrington Jan. 22, 2009 Report 7, and that repeating a phrase four times in a chorus is "not uncommon," Harrington Dep. 210:7-9. It is undisputed that the shared tempo is common. Plaintiffs claim their combination of those elements is protectible.

"[A] work may be copyrightable even though it is entirely a compilation of unprotectible elements." Knitwaves, Inc. v. Lollylogs Ltd., 71 F.3d 996, 1003-04 (2d Cir. 1995). In such cases, "'the author's original contributions'" are protectible, i.e., "the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." Id. at 1004, quoting Feist, 499 U.S. at 350, 358.

Defendants rely on Jean v. Bug Music, Inc., No. 00 Civ. 4022 (DC), 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002), arguing that the combination is unprotectible. There, the plaintiffs sought a declaratory judgment that their song did not infringe the defendants' song, and the district court granted the plaintiffs' claim on summary judgment. Id. at *1. The two songs shared the phrase "clap your hands" set to three notes which were identical in pitch and rhythm. Id. at *3. The court held that the combination of those elements was too "common and unoriginal" to

be protectible:  the lyrics "clap your hands" "appear often in church anthems and secular music," id. at *6, and "thousands" of songs contained the same three-note sequence in issue, which was "commonly" set to the same rhythm as in the defendants' song, id.

The record here is different.  Defendants have identified only six songs containing the five-note rhythm in issue. Ferrara Jan. 5, 2009 Report ¶¶ 59-61.  In but one of those six songs is the rhythm featured in the vocals, as opposed to an instrumental part of the song. See id.  Given the "extremely low" level of creativity that a work must possess to be copyrightable, see Feist, 499 U.S. at 345, it cannot be ruled summarily that plaintiffs' combination of the lyrics and rhythm in issue is unprotectible:  reasonable jurors might reach another conclusion upon a full trial of that issue.

Defendants have identified one song — "This Is How We Do" by the group Westview — that features the lyrics "this is how we do" set to a rhythm "very similar" to the one featured in "Elevator". UMG Defs.' 56.1 Stmt. ¶ 50.  That song, however, has a copyright date of 2004, and plaintiffs wrote "Elevator" in 2002.  It thus cannot be used to show that plaintiffs did not independently create "Elevator", and therefore cannot render "Elevator" unoriginal. See Feist, 499 U.S. at 345-46.

Defendants argue that the differences between "Elevator" and "How We Do" demonstrate that the two songs are not substantially similar. "[I]n comparing works for infringement purposes . . . we examine the works' total concept and feel." Knitwaves, 71 F.3d at 1003 (internal quotation marks omitted). Though "numerous differences tend to undercut substantial similarity," Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 913 (2d Cir. 1980), "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.).

The only portions of the two songs that could be considered substantially similar are the ones in which the phrase "this is how we do" appears. Listening to the two songs reveals significant differences in their other portions. However, the combination of the lyrics and rhythm in issue is repeated throughout both songs, constituting every second line of both songs' choruses. Ferrara Jan. 5, 2009 Report ¶¶ 16-17. Its prominence in both songs, combined with the similar manner in which both songs feature it, could allow a reasonable jury to conclude that the songs are substantially similar. See BMS Entm't/Heat Music LLC v. Bridges, No. 04 Civ. 2584 (PKC), 2005 WL 1593013, at *5 (S.D.N.Y. July 7, 2005) (court could not rule

- 19 -

as matter of law that two songs that "combine[d] a call-and-response format, the lyrics 'like that' preceded by a one-syllable word," and a particular rhythm were not substantially similar where "[t]hese elements in combination are repeated multiple times in each composition and arguably constitute the hooks in each song").

### 5.  Independent Creation

A defendant may rebut a plaintiff's prima facie case of infringement with evidence of independent creation. Defendants argue that the declarations of the How We Do Writers are unrebutted evidence that "How We Do" was independently created. However, it is clear from the foregoing discussion that whether "How We Do" was independently created or not involves factual issues that are not susceptible of summary judgment. See Repp, 132 F.3d at 889-91.

### The BWS Defendants' Motion

The BWS Defendants argue that they are entitled to summary judgment because they do not own the copyright in "How We Do" and did not cause plaintiffs' alleged damages.

Taylor states that he is the sole owner of both BWS Defendants (Black Wall Street Records, LLC and Black Wall Street Publishing, LLC), which were formed to operate as a record label and related publishing company. Taylor Mar. 17, 2010 Decl. ¶¶ 3-

5.   Both Taylor and John Dash, the BWS Defendants' accountant and business manager, state that neither of the BWS Defendants owns any copyrights, is an owner or transferee of the copyright in "How We Do", or collects income from the exploitation of "How We Do". Id. ¶¶ 6-7; Dash Decl. ¶¶ 1, 5-9.

Taylor included the three-word name "Black Wall Street" on the copyright registration for "How We Do", Taylor Mar. 17, 2010 Decl. Ex. 3, at P00061, as well as on both his ASCAP Membership Agreement and ASCAP Publishing Application, id. Exs. 1-2.   He explains that, "'Black Wall Street' is an assumed name that refers to me as an individual and in no way relates or refers to either of the [BWS] Defendants in this action." Id. ¶ 12.

In his ASCAP Membership Agreement, Taylor lists his legal name as "Jayceon T. Taylor". Id. Ex. 1, at ASCAP00025.   "Black Wall Street" is listed on the line for "Publisher Applicants Only" to give their company name. Id.   That line is also stamped with "Jayceon T. Taylor D/B/A BLACK WALL STREET". Id.   Taylor similarly lists "Black Wall Street" as his company name on his ASCAP Publisher Application. Id. Ex. 2, at ASCAP00019.

The "How We Do" copyright registration names each of the How We Do Writers as authors. Id. Ex. 3, at P00058, P00060. Only the four individual writers are named, and Taylor is listed as "Jayceon Taylor p/k/a 'The Game'". Id.   The Copyright

Claimant section, however, does not list any of the other individual authors. It has five entries comprised entirely of corporate or other organizational claimants on a continuation sheet of the copyright registration application, and one entry which names Taylor as a claimant as "Jayceon Taylor a/k/a Black Wall Street/Each1Teach1". Id. Ex. 3, at P00058, P00061.

None of the copyright registration documents refers to Black Wall Street Records, LLC or Black Wall Street Publishing, LLC. Nor do Taylor's ASCAP applications.

Plaintiffs argue that there is or may be a question of fact whether "Black Wall Street" is a name assumed by Jayceon Taylor or something else, but that is not the issue. The point is that plaintiffs have produced no evidence whatsoever that either of the two separate legal entities Black Wall Street Records, LLC and Black Wall Street Publishing, LLC, although owned by Mr. Taylor, had anything to do with the copyright infringement alleged in this case. Accordingly, the BWS Defendants' motion for summary judgment is granted.

### Conclusion

For the reasons stated above, the parties' motions for summary judgment are denied, except for that of the BWS Defendants which is granted.

The parties shall appear for a conference on February 25,

2011 at 12:30 p.m. to discuss, among other things, the schedule for any remaining discovery and the preparation of the parties' joint pre-trial order and other pre-trial materials, and setting a date for trial.

So ordered.

Dated:   New York, New York
         February 1, 2011

                                    _Louis L. Stanton_
                                    LOUIS L. STANTON
                                    U. S. D. J.